IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KIMBERLY DAWN HOWARD,

        Plaintiff,

        v.                                Civil Action No. 2:06-cv-45

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.    <u>Background</u>

    Plaintiff, Kimberly Dawn Howard, (Claimant), <u>pro se</u>, filed her Complaint on May 2,

2006, seeking Judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an

adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]

Commissioner filed his Answer on July 13, 2006.[2] Claimant filed her Motion for Summary

Judgment on August 10, 2006.[3] Commissioner filed his Motion for Summary Judgment on

September 11, 2006.[4]

B.    <u>The Pleadings</u>

---

    [1] Docket No. 1.

    [2] Docket No. 8.

    [3] Docket No. 11.

    [4] Docket No. 12.

1.  Claimant's Motion for Summary Judgment.[5]

2.  Commissioner's Motion for Summary Judgment.

C.  Recommendation

I recommend that:

1.  Claimant's Motion for Summary Judgment be DENIED.

2.  Commissioner's Motion for Summary Judgment be GRANTED since substantial evidence supports the ALJ's residual functional capacity and his decision that work exists for Claimant in substantial numbers in the national economy and because none of the medical records Claimant provided the Court present new and material evidence.

## II.  Facts

A.  Procedural History

Claimant filed applications for Social Security Disability Insurance Benefits and Supplemental Security Income on February 20, 2004, alleging disability since December 9, 2003.  The application was denied initially and on reconsideration.  Claimant requested a hearing before an ALJ, and received a hearing on September 13, 2005.  The ALJ issued a decision adverse to Claimant on September 22, 2005.  Claimant requested review by the Appeals Council, but it denied this request.  Claimant filed this action, which proceeded as set forth above.

B.  Personal History

Claimant was 33 years old on the date of the September 13, 2005 hearing before the ALJ.

---

[5] On August 10, 2006, the Court received a package of medical records from Claimant, along with a cover letter.  The district judge construed the cover letter as a Motion for Summary Judgment in light of Claimant's pro se status (docket 13).

Claimant has a high school education. Claimant has prior relevant work experience as a certified nurse's aide and a living assistant.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: December 9, 2003 – September 22, 2005.[6]

**I. Frank Hartman, M.D., 3/15/00, Tr. 133**
Admitting impression: abdominal pain, cellulitis, fascitis, possible rectus abdominis tear, type 2 diabetes mellitus, overactive bladder by history, status post deep venous thrombosis of the right leg, status post panniculectomy

Final diagnosis: abdominal infection, cellulitis versus fascitis, type 2 diabetes mellitus, obesity, statust post panniculectomy

**I. Frank Hartman, M.D., 3/11/00, Tr. 143**
Admitting impression: abdominal pain, cellulitis, fascitis, possible rectus abdominous tear, type 2 diabetes mellitus, overactive bladder by history, status post deep venous thrombosis of the right leg

**Khalid Hayat, M.D. and I. F. Hartman, M.D., 3/11/00, Tr. 159**
Impression: changes with the anterior abdominal wall inferior to the umbilicus.  The changes may present cellulitis or fascitis.

**I. F. Hartman, M.D., 3/14/00, Tr. 160**
Impression: extension of inflammatory changes towards the left groin region.  The degree of inflammation of the lower anterior abdominal wall inferior to the umbilicus is not changes in that region.  The radiographic appearance is consistent with a cellulitis/ fascitis.

**Paul Kramer, M.D., 1/15/03, Tr. 175**
Discharge diagnoses: chronic pelvic pain, adhesions, diabetes mellitus, degenerative joint disease, history of panniculectomy

**Paul Kramer, M.D., 1/13/03, Tr. 177**

---

[6] Much of the evidence in the record comes from before Claimant's alleged onset date of disability.  Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004).

Preoperative diagnoses: pelvic pain with abdominal adhesions

Postoperative diagnoses: pelvic pain with abdominal adhesions

**Paul Kramer, M.D., 1/13/03, Tr. 179**
Final pathologic diagnosis: Uterus, cervix mild chronic cervicitis, uterus, endometrium polyp, ovaries with no abnormalities, fallopian types with no significant pathological changes, except that there is one with a hydatid cyst.

**Sheila Clark, B.S., 10/18/02, Tr. 207**
Diagnostic impression:
Axis I: post traumatic stress disorder
Axis IV: pending hysterectomy

**Susan Smith, M.D., 4/20/00, Tr. 226**
Pre-operative diagnosis: abdominal pain

Post-operative pain: intra-abdominal adhesions

**Susan Smith, M.D., 4/11/00, Tr. 234**
Pre-operative diagnosis: abdominal pain, rectal bleeding

Post-operative diagnosis: normal colonoscopy

**Sean Barnett, PA-C, 12/13/03, Tr. 237**
Admitting impression: biliary dyskinesia and ventral hernia

Final diagnosis: biliary dyskinesia and ventral repair

**Susan E. Long, M.D., 12/14/03, Tr. 238**
Principal diagnosis: chronic cholecystitis, biliary dyskinesia, ventral hernia

Secondary diagnosis: diabetes, depression, asthma

**Susan E. Long, M.D., 12/10/03, Tr. 239**
Pre-operative diagnosis: biliary dyskinesia and ventral hernia

Post-operative diagnosis: biliary dyskinesia and ventral hernia

**Susan Long, M.D., 12/10/03, Tr. 242**
Final pathologic diagnosis: gallbladder, cholecystectomy: chronic cholecystitis

**Sean Barnett, PA-C and Susan E. Long, M.D., 12/5/03, Tr. 243**
Assessment: biliary dyskinesia, ventral hernia, ganglion cyst, left foot, lesion, inner thigh

**Morgan D. Morgan, M.A. and Ronald D. Pearse, Ed.D., 4/8/04, Tr. 252**
Diagnostic impression:
Axis I: major depressive disorder, recurrent, moderate, without full interepisode recovery
Axis III: reported abdominal hernia, diabetes, back pain, heart murmur, and drug allergies

Prognosis: fair

**Samuel K. Roberts, M.D., 4/12/04, Tr. 258**
Assessment: chronic low back pain with lumbar degenerative joint disease, history of GERD and Gi bleed with chronic NSAID use and this is likely NSAID gastritis, morbid obesity, diabetes mellitus type 2 which is now insulin-dependent, depression and anxiety

Prognosis: good

**Psychiatric Review Technique, 4/13/04, Tr. 267**
12.04 Affective Disorders
> The person has MDD.

Functional limitation and degree of limitation
> Restriction of activities of daily living: mild
> Difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace: moderate
> Episodes of decompensation, each of extended duration: none

The evidence does not establish the presence of the "C" criteria of the medical listings.

**Mental Residual Functional Capacity Assessment, 4/13/04, Tr. 279**
Understanding and memory
> The ability to understand and remember very short and simple instructions: not significantly limited
> The ability to remember locations and work-like procedures, the ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence
> The ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work related decisions: not significantly limited
> The ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being distracted by them, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
> The ability to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances: no evidence of limitation

Social interaction
        The ability to ask simple questions or request assistance, the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited
        The ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors: no evidence of limitation

Adaptation
        The ability to be aware of normal hazards and take appropriate precautions, the ability to set realistic goals or make plans independently of others: not significantly limited
        The ability to respond appropriately to changes in the work setting: moderately limited
        The ability to travel in unfamiliar places or use public transportation: no evidence of limitation

**Physical Residual Functional Capacity Assessment, 4/19/04, Tr. 283**
Exertional limitations
        Occasionally lift and/or carry 50 pounds
        Frequently lift and/or carry 25 pounds
        Stand and/or walk for a total of about 6 hours in an 8 hour work day
        Sit for a total of about 6 hours in an 8 hour work day
        Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
        Extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, hazards: unlimited
        Extreme cold: avoid concentrated exposure

**Amy Pearson, M.D., 6/21/01, Tr. 305**
Impression; degenerative arthritis noted bilaterally at the facet joint. At the L5-S1 level, no herniated discs are seen.

**Robinson Family Chiropractic, 5/3/04, Tr. 308**
Assessment: DT is in moderate to major discomfort.

**Robinson Family Chiropractic, 6/4/04, Tr. 308**
Assessment: PT appears to be in major discomfort

**Robinson Family Chiropractic, 2/28/04, Tr. 309**
Assessment: PT is in severe discomfort

**Robinson Family Chiropractic, 11/21/03, Tr. 312**
Assessment: PT is maintaining

**Robinson Family Chiropractic, 12/4/03, Tr. 312**
Assessment: PT is in moderate discomfort

**Robinson Family Chiropractic, 10/13/03, Tr. 314**
Assessment: PT is in moderate to severe discomfort

**Robinson Family Chiropractic, 11/13/03, Tr. 314**
Assessment: PT is in moderate discomfort

**Robinson Family Chiropractic, 10/2/03, Tr. 315**
Assessment: PT is in moderate to severe discomfort

**Robinson Family Chiropractic, 8/26/03, Tr. 318**
Assessment: PT is worse again

**Robinson Family Chiropractic, 9/9/03, Tr. 318**
Assessment: PT is in moderate distress

**Robinson Family Chiropractic, 8/15/03, Tr. 319**
Assessment: PT is showing improvement

**Robinson Family Chiropractic, 8/22/03, Tr. 319**
Assessment: PT is maintaining

**Robinson Family Chiropractic, 7/31/03, Tr. 321**
Assessment: PT is maintaining

**Robinson Family Chiropractic, 8/11/03, Tr. 321**
Assessment: PT is in severe discomfort due to over exersition [sic]

**Robinson Family Chiropractic, 7/22/03, Tr. 322**
Assessment: PT is showing slight improvement

**Robinson Family Chiropractic, 7/17/03, Tr. 324**
Assessment: PT is showing improvement

**Robinson Family Chiropractic, 7/23/03, Tr. 324**
Assessment: PT is maintaining

**Robinson Family Chiropractic, 7/7/03, Tr. 325**
Assessment: PT is showing gradual improvement

**Robinson Family Chiropractic, 7/16/03, Tr. 325**
Assessment: PT is worse today

**Robinson Family Chiropractic, 6/19/03, Tr. 327**
Assessment: PT is worse today due to being ill

**Robinson Family Chiropractic, 6/26/03, Tr. 327**
Assessment: PT is worse

**Robinson Family Chiropractic, 6/13/03, Tr. 329**
Assessment: PT is showing slow, but steady improvement

**Robinson Family Chiropractic, 6/5/03, Tr. 330**
Assessment: PT is worse today

**Robinson Family Chiropractic, 6/9/03, Tr. 330**
Assessment: PT is slightly better.

**Robinson Family Chiropractic, 6/2/03, Tr. 332**
Assessment: PT is maintaining

**Robinson Family Chiropractic, 6/4/03, Tr. 332**
Assessment: PT is showing slow but steady improvement

**Robinson Family Chiropractic, 5/28/03, Tr. 333**
Assessment: PT is showing slight improvement

**Physical Residual Functional Capacity Assessment, 8/5/04, Tr. 340**
Exertional limitations
       Occasionally lift and/or carry 50 pounds
       Frequently lift and/or carry 25 pounds
       Stand and/or walk for a total of about 6 hours in an 8 hour work day
       Sit for a total of about 6 hours in an 8 hour work day
       Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Sara Dilly, D.O., 7/1/05, Tr. 355**
Assessment: diabetes mellitus type II, poorly controlled, arthralagias, renal failure, questionable somatization disorder, elevated liver enzymes, hernia, rectal bleeding, legal problems

**Faith Moore, C-FNP, 5/13/05, Tr. 357**
Assessment: DM type 2 uncontrolled, hypertension uncontrolled, pharyngitis

**Faith Moore, C-FNP, 4/25/05, Tr. 358**
Assessment: DM type II, uncontrolled, eustachian tube dysfunction, epigastric pain, vomiting, diarrhea

**Patricia Collett, PA-C, 3/24/05, Tr. 360**
Assessment: Acute sinusitis

**Faith Moore, C-FNP, 2/7/05, Tr. 363**
Assessment: diabetes type II, uncontrolled, knee pain bilaterally, low back pain

**Faith Moore, C-FNP, 1/20/05, Tr. 365**
Assessment: diabetes mellitus type II, obesity, right OM, sinusitis, pharyngitis, musculoskeletal back pain

**M. Mujib Rahman, M.D., 11/14/05, Tr. 400**
Assessment: cervicogenic heachache, cervical radiculopathy, anxiety depression, diabetes mellitus, gastroesophageal reflux, hypertension, chronic pain syndrome.

**Muhammad Rahman, M.D., 11/21/05, Tr. 402**
Impression: degenerative changes at C5-6 and C6-7 without focal herniation, mild degrees of foraminal narrowing and central stenosis

**Muhammad Rahman, M.D., 11/21/05, Tr. 403**
Impression: bilateral maxillary sinus disease, possibly mucosal retention cysts or polyps

D.      Testimonial Evidence

Testimony was taken at the September 13, 2005 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q       Do you have a driver's license?

A       Yes, I do.

Q      Do you drive a car?

A      Yes.

Q      About how many miles do you drive in a week?

A      Maybe six [INAUDIBLE] because I don't go many places.

Q      Just tell me - - give me some idea where you do have to drive to and from?

A      Usually from my house to the doctors, if I can, and back home.  Then from my house to the grocery - -

Q      Is that to Buchanan?

A      Yes.

Q      In Buchanan?

A      Buchanan.

Q      How far is that from where you live?

A      Well, from my house to the doctor's office is about 13 miles.

Q      Okay.  And where else?

A      And to the grocery store.

Q      What about to visit friends or relatives?

A      I live next door to my mother, and that's about as far as I go.

Q      Okay.  You walk there?

A      Yes.

Q      You take trips with your daughter in the car to the park or to camp or whatever?

A      Well, we go grocery shopping or if I go to the doctors, I take her with me [INAUDIBLE].

Q        How does she get to school?

A        School bus.

Q        Do you have to visit her in school?

A        I had to pick her up yesterday because she was sick.

*                    *                    *

Q        Do you smoke?

A        Only a little.

Q        How much is a little?

A        Usually a pack of cigarettes in two days.

*                    *                    *

Q        Tell me in your own words what it is that keeps you from working now.

A        As of now, like I said, I had a hernia tear again as of [INAUDIBLE] this month, past month and then the doctor informed me that I could not ever lift a [INAUDIBLE].  And if I were to lift anything, I'd [INAUDIBLE] rip it all out.  And a lot of times, I [INAUDIBLE]. [INAUDIBLE].

*                    *                    *

Q        Before you had the surgery done, okay then, tell me what you were able to do.

A        Well, [INAUDIBLE] eat my breakfast, do a few dishes, sweep a little bit, run the sweeper, wipe down my walls a little and that would be about it because [INAUDIBLE] did the work, it would hurt my back because I had my back injury from when I worked as a nurse's aide.

Q        Is it safe to say you were able to do light things in the house?  Light duties?

A        Very light, as long as I took breaks in between and [INAUDIBLE] my back out.

Q       Were you able to vacuum?

A       A little.  My living room's small.

Q       How about visiting with relatives or friends?

A       We go nowhere.  I stay at home [INAUDIBLE] my mother and sometimes, I go [INAUDIBLE].

Q       How much are you able to lift and carry across the room before your surgery?

A       I don't know.  Very much because my back starts hurtin'. [INAUDIBLE].

Q       A bag of potatoes?

A       Maybe a bag of potatoes, five pound bag.

Q       Could you carry that across the room?

A       No.  Just from like my kitchen [INAUDIBLE] to my counter-top [INAUDIBLE].

Q       How long can you sit without having to get up?

A       30 minutes is pushing it.

Q       How about stand without having to sit down?

A       About [INAUDIBLE] because if I stay too long, then my back starts aching and my hips starts [INAUDIBLE] hurts like a toothache.

                    *             *             *

Q       Are you walking, getting any exercise to help with your blood sugar?

A       Well, before the surgery, I was walking from my - - where I live to church and back would be a mile.

Q       How far is that?

A       From my house to the church and back to my house, be one mile.

A      My daughter will pick up the laundry and put it in the washer.  She would help me separate them, and she puts them in the washer, and I keep the detergent there and she pours in and I start it for her because I'm not allowed to bend over yet.

Q      Okay.  You're suffering with the diabetes, depression.  You call yourself a slow learner.  I'm not calling you that, okay.  That's something that someone else has said.  I'm not sure that I consider you a slow learner.  Sounds like you've done well with what you have to work with.  So, is there anything else that's bothering you?  Your back, your back pain, what is that on a daily basis, on a scale of 1 to 10.  What is your back pain like?

A      It's usually about a six to a seven.  It just depends if I've overworked it, like going on walk too far or before I had the surgery, if I would bend down and I tried to do anything on the floor.  And [INAUDIBLE] bend over would aggravate my back and cause it to flare up more [INAUDIBLE].

Q      Did you have any exercises for your - - to strengthen your back before you had the surgery?

A      No.  they didn't give me none.  they just told me to walk - -

Q      Did the chiropractor - - the chiropractor just told you to walk?

A      Yeah.  He said do a lot of walking and he said that I would lean up against a wall [INAUDIBLE].  It didn't really help.  It just aggravated it even more.  It would pop out and I had to go back and he'd have to put it back in and [INAUDIBLE] my hips and everything.

Q      Have any pets?

A      Well, my daughter has two puppies and a cat.  And she - - she goes outside, she

feeds them and she's very responsible of them.

Q    Do you have any help with your daughter or does she require any help or assistance at home for you?

A    I take care of her.  I mean, she's [INAUDIBLE] she can do, and I [INAUDIBLE] her to be all she can be and not let anybody ever hold her down.

*         *         *

[EXAMINATION OF CLAIMANT BY HER ATTORNEY]

Q    And as you said, the diabetes plays into that as far as healing.  What other sort of problems does diabetes cause you, if any?

A    I get light-headed; I get nauseous.  I get headaches with them, which [INAUDIBLE] my migraines appear from the diabetes, which there's days I [INAUDIBLE] move because of the headaches.

Q    Let's talk about the headaches for a minute because the records indicate numerous times when you've come in reporting headaches.  What do you think triggers your headaches?

A    I don't know.  I mean, [INAUDIBLE] I thought it was orange juice because of being diabetic, but when I check my sugar, my sugar's low, and I hadn't had no orange juice for one month, and I'm still getting the headaches.  I could wake up with a slight headache, and if I walk into a group that's like wearing cologne or smell the coffee, at that time, it will trigger such a headache, I've actually thrown up, I've got diarrhea.  I'm just - - I'm physically [INAUDIBLE] and I can't function.

Q    Okay.  The records indicate sometimes that you've report that the headaches are triggered by light.  Is that correct?

A       Yes.

Q       Sometimes by sound?

A       Uh-huh.  After flipping over the TV [INAUDIBLE] constantly pounding on the [INAUDIBLE] or playing real loud music will trigger it.

Q       Okay.  And when you have the migraines, the headaches, the records indicate that you have some nausea and some vomiting with that generally.

A       Yes.

Q       Is that something that usually happens?

A       Oh yeah.  Every time I get a real sick headache, I end up throwing up, and it's [INAUDIBLE] and on the other end., I'm burning up.  I'm miserable and I usually have to crawl in bed [INAUDIBLE].  And I lay there with an ice pack on my eyes and forehead, hoping to ease the pain.  And I think the floor [INAUDIBLE].  It's the medicine the doctor, he gave me, for migraine -

Q       You have a medicine that's prescribed specifically for headaches.

A       Yeah.

Q       And do you take other medicine as well?

A       Yeah.  Within two hours of [INAUDIBLE] the medication he's gave me, I usually take two Excedrin Migraines on top of that, trying to get rid of it.  And when the migraine goes away, I feel like my brain is bruised.  I just feel weak, I just feel drained, I still have this sensitive stomach, nausea feeling that's still there for at least 24 hours.

Q       Okay.  And like you said, there's been numerous times when you've gone to the doctor reporting these.

A        Yeah.

Q        Are there also other times when you have these headaches and you don't go to the doctor?

A        Yes.  I've had, since my surgery, seem like every couple days I have one.  I mean last week, I had [INAUDIBLE].  Like I had one Sunday, one on Wednesday, and Friday, I was sick.  I couldn't even function.

Q        Okay, and these were the type of headaches we were talking about where you had to go lay down - -

A        Yeah, lay down, close the curtains, close the - - all the lights off into the house and run the [INAUDIBLE] on me.  Put the ice bag on my face and everything.

Q        How many times per month do you estimate that - - we're talking averages, that you'd have these type of headaches?

A        Lately, I been having them three times a week.  And there's what, four weeks in a month.  So, about - -

Q        So, about 12 times - - that's been since the surgery, or right before that?

A        Well, before the surgery, I was having them at least any time [INAUDIBLE].  [INAUDIBLE] I couldn't function.

Q        So, you'd have a couple a week before that?

A        Yeah.

Q        And you think they've gotten a little worse since the surgery?

A        I think so worse because [INAUDIBLE] the stress of the surgery and the [INAUDIBLE] triggered it.  And I just - - seems like it [INAUDIBLE].  I guess I was so sick, I

got home, and I just wanted to crawl in bed and actually die.  I feel so bad with my head hurtin and nausea.

Q        One of the other medications that you've been prescribed is for anxiety and nerves.

A        It is like a [INAUDIBLE].  It is to help calm the nerves, help with the stress and the anxiety of going out and socializing with people. [INAUDIBLE] because I am up until 3 or 4 o'clock in the morning.  I can't sleep.  I'm up.  I feel like a cat, prowling.  I'm always looking around.  I can't sleep and [INAUDIBLE] was supposed to help me sleep, and I [INAUDIBLE] gotten into bed by 1:30.  I usually wake up at 3 and then I wake up again at 5. [INAUDIBLE] sleep.

Q        Well, what - - maybe you could describe it in a little bit more detail.  You hit on it a little bit before about not liking crowds.  Maybe you can describe some of the feelings that you have with regard to that anxiety.

A        I just - - when I go into crowds, I feel like is he looking at [INAUDIBLE] face. [INAUDIBLE] .  I know I'm fat, so [INAUDIBLE] because of my weight?  I [INAUDIBLE]. And I will actually slip off down the hallway to get away from it all. [INAUDIBLE].  And if I'm by myself, I don't have to hear it.  You know, I feel like people are pointing fingers at me and making fun of me and criticizing the way I look.

Q        You made the comment to me one time when we were talking that sometimes you take your mom and your daughter with you - -

A        Yeah, I take my - -

Q        - - for excuses to get out.

A        - - yeah, get out places.  If I, like if I take my mom in the [INAUDIBLE].  She has a bad knee, and [INAUDIBLE] grocery store, and I know if I take her to the grocery store, we're gonna get out of there quick because she [INAUDIBLE].  [INAUDIBLE] she'll get a panic attack or she'll get a behavior started, or she sits there and she screams, oh we gotta go, bye.  Or, if I'm by myself, I will [INAUDIBLE] a headache, and I might even [INAUDIBLE] the headache because I actually [INAUDIBLE] myself into the headache. [INAUDIBLE] I just don't feel comfortable.

Q        Do you think maybe some of these social anxiety problems was some of the cause of the problems that you started to have with your ex-husband?

A        Yeah because he was such an outgoing person.  He wanted to go out.  He wanted to go out and have a drink.  He wanted to go socialized with friends.  He just wanted to get out and do things, and I was to the point where we need groceries, honey.  Here, take the - - here's the check, here's the bills, here's the money, you know [INAUDIBLE].  I would stay here at the house [INAUDIBLE].

Q        Now, the jobs that you found yourself working actually kind of helped contribute to that some.

A        Yeah.

Q        Or were conducive at least to your problems.  Is that correct?

A        Yeah, because when I worked for [INAUDIBLE] and she'd take her client and I'd have my client, and I would take my client and we'd go to the [INAUDIBLE].  There wasn't a lot  of hassle.  Nobody [INAUDIBLE].

Q        But you were working like on a hospital floor with numerous patients, but one on

one with the people - -

A       Yeah.  Like I had an evening job where I had eight patients and [INAUDIBLE].
They're not like adults, but I treat them like an adult. [INAUDIBLE].  I would sit there and talk
to them, take care of them, do what I have to do [INAUDIBLE].  I had one aide I worked with
and one nurse.  And we did all our own thing.

Q       You mentioned that you have trouble sleeping.  Do you nap at all during the day?

A       No.

Q       No.

A       I'm up all day.  I get up at 6:30, well 6:15 I get up [INAUDIBLE].  I get up; I stay
up, unless I get up with one of them sick headaches and I go in there and try to lay down and try
to rub it off.  Most of the time, I'm up all day.

Q       Okay.  So, you reserve that laying down to being the treatment for your
headaches.

A       Right.

                              *             *             *

Q       Okay.  The last thing I wanted to ask you about was - - and I think that's how it
was worded in your application, was that you were a slow learner.  And I, again I think it was
coined, but what do you mean by that when you say that?

A       Well, people says oh, I can do this here, you can do this.  But, when it comes
down to writing a story or writing something, [INAUDIBLE], you know what I mean?  So,
[INAUDIBLE].  And when it comes to spelling, I can't spell worth a lick.  I mean, I have to ask -
- [INAUDIBLE] keep the dictionary there.  And my poor niece is 12, comes home with her

English book and she's like help me and I'm like help you?  You gotta help me first.  I don't know what I'm looking at.

Q    You said that your daughter is now in some special education classes.

A    Yes.

Q    And you find  that she's doing the same sort of things that you've had problems with.

A    Yes.  When I was growing up, I would look at something and it take me forever in my mind to get where I had to discuss it on paper.  It was like I was looking at something and I could see it like, it wasn't in the right order, seem like.  I mean [INAUDIBLE].  If I try to read something fast, I always get it wrong.  It just like it just doesn't register.  And I notice my daughter, she'll write her name, but she writes it backwards.  She'll put the N-O-S-K-C-I-D, and she does that.  We are so much alike in stuff like that, and it'll take her forever.  She's in fourth grade; she can't even read.

Q    Well, you have difficulties with reading?

A    Yes.  I have to read small words.  I cannot read the big words.  I have trouble [INAUDIBLE].  I've actually got to the point where when I read, it'll trigger a migraine now too when I read a lot.  And I [INAUDIBLE].  And I see the words are too big and I don't know the word, forget the book, it stays where it is and I move on to something different.

                    *              *              *

Q    Well do you feel like you could re-train to do other jobs?

A    I [INAUDIBLE] on keyboards.  I mean, I can't type.  How would I be able to train on a computer.  When I look at them, [INAUDIBLE] foreign language sitting there looking

at me [INAUDIBLE].

Q        You have difficulty following instructions?

A        It has to be wrote out, plus told to me, and then that's [INAUDIBLE] because I called here, the Social Security office three times to make sure I knew, before I talked to you, where I was going. It's just [INAUDIBLE]. And I can take a message for somebody, and I can write it down and I'll hand it to them, and they're like okay now, what is this message supposed to mean? [INAUDIBLE] something that's supposed to be there, like the time or place. Something crucial's always missing. [INAUDIBLE]. But, it's never there.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q        Would you characterize the claimant's past work?

A        Yes. Her work as a certified nurse's assistant [INAUDIBLE] medium exertional [INAUDIBLE]. It's SVP 4, semi-skilled and the claimant testified she was working at times heavy exertional. The mental retardation/mental health living assistant aide, that's also [INAUDIBLE] medium exertion. Also SVP 4, semi-skilled. [INAUDIBLE].

Q        All right. As a nurse's aid, that's semi-skilled?

A        SVP 4.

Q        All right. Would you take a person with the claimant's age, background, work experience, education, and consider a range of light work with occasional postural, no ropes, ladders, scaffolds, climbing of any kind, is to avoid extremes of heat and cold, in a low-stressed environment, and by that, I mean at an entry level unskilled, simple instructions, one and two step processes, routine and repetitive work, working with things rather than people, sit/stand

option, no noxious odors, fumes, chemicals, or gases. Could that hypothetical person perform the claimant's past relevant work?

A        No, ma'am.

Q        Are those skills transferrable?

A        [INAUDIBLE].

Q        Could she perform any duties, any jobs in the economy [INAUDIBLE]?

A        [INAUDIBLE] the hypothetical as given, work as a mail sorter, there are 100,000 nationally; in the region, 1,000. [INAUDIBLE] machine operator, 80,000 nationally; 400 regionally. A sewing machine operator, 80,000 nationally, over 300 regional. That's a sampling, Your Honor.

Q        All right. Would either of those jobs require a high degree of ability to read and write and complicated instructions because one of the conditions that I did ask for was simple instructions.

A        Okay. [INAUDIBLE].

Q        So, that's assuming regular classes.

A        [INAUDIBLE].

Q        Fourth grade education.

A        [INAUDIBLE].

Q        All right. Sedentary, use the same hypothetical, but reduce the level of work to a sedentary job.

A        Okay, [INAUDIBLE] the hypothetical as given, work as a paper [INAUDIBLE] layout, 60,000 nationally; 300 regional. Document preparer for microfilming, 60,000 nationally;

regionally 400. [INAUDIBLE], 75,000 nationally; 400 regional.  And that's a sampling, Your Honor.

Q      The [INAUDIBLE] orders.

A      It's not a problem with the definition [INAUDIBLE].

Q      All right.  What if, in either of these positions, or either of these job levels, a person is off task 10 percent of the time due to lack of concentration, persistence, and pace?

A      [INAUDIBLE].

Q      Have you testified consistent with the DOT, including the sit/stand option?

A      Yes.  Sit/stand option is based on [INAUDIBLE].

Q      All right.

ALJ      Questions, Mr. Malcolm?

ATTY      Just a couple, Your Honor.

EXAMINATION OF VOCAL EXPERT BY ATTORNEY:

Q      So, just to clarify, that 10 percent would be the minimum amount of time that a person could be off tasks during a day.  And if they were off task for more than the 10 percent, then all of the jobs, both light and sedentary that you've named, would be eliminated.  Is that correct?

A      [INAUDIBLE].

Q      Okay.  With regard to absences from employment, what is the minimum number of absences that a person could  have due to health related issues and still also be employable?

A      Individual missed more than two days a month consistently, he wouldn't be able to maintain any of these jobs.

Q       Now, when you're talking about two days per month total, say an individual were to begin to have a headache or something during the day and be forced to miss an afternoon or portions of the day, would that make any difference, or would it - - you would take that into account as reaching that two-day total sum that would unacceptable?

A       That's a very good question.  It's based on a chart.  What you're looking as [INAUDIBLE].   [INAUDIBLE].

Q       Okay.  So, you're saying that they could miss the last hour, but that still assumes that they're making up the work by increasing their pace either that day or the next day when they come in so that they're still maintaining that 10 percent window.

A       [INAUDIBLE] next day the person came in, they would have to be able to stay there.  If they was to do that two days in a row, along with missing an additional day, then no.  I would count that - - that [INAUDIBLE].  Anything beyond that, you get [INAUDIBLE].

Q       Okay.

*                    *                    *

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•       Has no problems in attending to her personal care (Tr. 90)

•       Prepares light meals such as soup, sandwiches, and frozen dinners (Tr. 90)

•       Can wash a light load of laundry (Tr. 91)

•       Shops for things in stores and by mail (Tr. 92)

- Handles money by paying bills, counting change, using a savings account and checkbook, and using money orders (Tr. 92)

- Dusts furniture, washes dishes, and mends clothes (Tr. 98)

- Reads books, watches television, and listens to the radio, records and tapes (Tr. 99)

- Enjoys sewing (Tr. 100)

- Obesity (Tr. 132, 262)

- Has a driver's license and is able to drive a car (Tr. 409-10)

- Smokes half a pack of cigarettes per day (Tr. 411)


### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

The precise arguments Claimant makes are unclear.  Claimant's Motion for Summary Judgment is only half a page long.  The Court is mindful that since Plaintiff is proceeding <u>pro se</u>, it must read Claimant's arguments in a liberal fashion.  <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).  The Court concludes Claimant has made the following three arguments.  First, Claimant argues the ALJ erred in calculating her residual functional capacity (RFC).  Second, Claimant contends the ALJ erred in finding she could perform other work existing in significant numbers in the national economy.  Finally, Claimant argues Commissioner should re-consider her case in light of new and material evidence she submitted.

Commissioner maintains that the ALJ's decision was supported by substantial evidence.  Commissioner argues the ALJ correctly determined Claimant's RFC.  Commissioner also contends the ALJ properly found worked existed Claimant could perform.  Finally,

Commissioner argues the new evidence submitted by Claimant would not have changed the ALJ's decision and should therefore be rejected by this Court.

B.  The Standards.

1.  Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.  Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.  Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.  Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.   Disability Prior to Expiration of Insured Status- Burden.   In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.   Social Security - Standard of Review.   It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.   Social Security - Scope of Review - Weight Given to Relevant Evidence.   The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.   Social Security - Substantial Evidence - Defined.   Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C. <u>Discussion</u>

I.

<u>The RFC the ALJ assigned to Claimant</u>

Claimant first argues the ALJ erred in calculating her RFC. Claimant contends the evidence demonstrates she does not have the capability to perform the work the ALJ determined she could. Commissioner argues substantial evidence supports the ALJ's RFC determination. The ALJ's decision will be upheld as long as it is supported by substantial evidence. Hays, 907 F.2d at 1456.

The RFC is what Claimant can still do despite her limitations. 20 C.F.R. § 404.1545. It is an assessment based upon all of the relevant evidence. Id. It may include descriptions of

limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities.  Id.  This assessment is not a decision on whether Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite her impairments.  Id.

In this case, the ALJ found Claimant had the RFC to perform light work with a sit/stand option.  (Tr. 32).  Claimant was limited to "unskilled, entry level, low stress, work with simple instructions for one to two step routine, repetitive tasks, working primarily with things rather than people."  (Id.).  The ALJ also found Claimant must work in an environment without "dust, fumes, pollutants, and hot/cold temperature extremes."  (Id.).  The job could not entail climbing ropes, scaffolds, or ladders.  (Id.).  The job could only occasionally involve climbing ramps or stairs and kneeling, crouching, crawling, balancing, and stooping.  (Id.).

The Court concludes substantial evidence supports the ALJ's RFC and the ALJ should therefore be affirmed in this regard.  The ALJ correctly found the evidence shows Claimant retains the ability to perform a number of functions.  The ALJ noted Claimant has the ability to sweep, mop, vacuum, and fix breakfast.  (Tr. 29, 415).  Claimant can lift a five pound bag.  (Tr. 29, 417).  She can sit and stand for thirty minutes at a time and has the ability to walk a mile.  (Tr. 29, 417, 419).  Claimant has a driver's license and is able to drive a car.  (Tr. 29, 409-10).

Furthermore, the ALJ found Claimant acted comfortably at the administrative hearing,

being "very animated in her presentation." (Tr. 29). The ALJ stated Claimant "sat with her legs crossed, relaxed, and was talkative with no discomfort noticed, even though she had just had surgery [the previous month]." (Id.). This is significant, for "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ's observations regarding Claimant's demeanor at the hearing give significant weight to the RFC given to Claimant.

Other evidence also supports the ALJ's decision. Less than a month before the hearing, Dr. Long, who treated Claimant, stated Claimant should simply be restricted from heavy lifting. (Tr. 377). Dr. Kenneth Robinson, who also treated Claimant, stated Claimant could return to work on numerous occasions. (Tr. 317, 320, 326, 328, 331). Two physical residual functional capacity assessments both found Claimant retained the ability to occasionally lift fifty pounds, frequently lift twenty five pounds, and sit or stand for six hours in an eight hour work day. (Tr. 284, 341). In sum, the record provides substantial evidence to support the ALJ's RFC.

## II.

### The ALJ's Determination Work Exists Claimant Can Perform

Claimant next challenges the ALJ's determination work exists in significant numbers for her in the national economy. Claimant argues that given her limitations, she cannot find work. Commissioner argues the ALJ properly determined work exists for Claimant. The ALJ's findings will be upheld as long as substantial evidence supports them. Hays, 907 F.2d at 1456.

The statute applicable to the issue here provides that to avoid an award of benefits, Commissioner must show "work which exists in significant numbers either in the region where

such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). In <u>Hicks v. Califano</u>, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), the Fourth Circuit stated (albeit in a footnote) that 110 regional jobs represents a significant number of jobs under the statute.

Based on the RFC the Court has already found supported by substantial evidence, the ALJ asked a Vocational Expert (VE) whether any work existed for Claimant. (Tr. 437-38). The VE responded affirmatively. (Tr. 438). The VE identified the positions of mail sorter, photographic machine operator, and sewing machine operator. (Tr. 31, 438). Three are 100,00 mail sorter jobs nationally and 1,000 regionally, 80,000 photographic machine operator jobs nationally and 400 regionally, and 80,000 sewing machine operator jobs nationally and 300 regionally. (Tr. 438). The VE also testified Claimant could perform sedentary work as a taper for printer circuits, a document preparer for microfilming, and a laminator. (Tr. 31, 438). The VE stated there are 60,000 taper jobs nationally and 300 regionally, 60,000 document preparer jobs nationally and 400 regionally, and 75,000 laminator jobs nationally and 400 regionally. (Tr. 31, 438).

Given that <u>Hicks</u> found 110 regional jobs a significant number of jobs, the ALJ clearly relied on a significant number of jobs in this case. <u>Hicks</u>, 600 F.2d at 1051 n.2. Substantial evidence supports the ALJ's conclusion significant numbers of jobs exist that Claimant can perform.

III.

<u>The Additional Documents Claimant Provided the Court</u>

Finally, Claimant asks the Court to return the case to the ALJ because of allegedly new and material evidence she submitted with her Motion for Summary Judgment. Commissioner

31

disputes the relevance of the evidence and urges the Court to affirm the ALJ.

For this Court to order remand based on additional evidence, Claimant must present new and material evidence the ALJ did not have available at the prior proceeding. 42 U.S.C. § 405(g). Claimant must also present good cause for the failure to incorporate the evidence at the prior proceeding. Id. As the Fourth Circuit stated, "The district court may only order additional evidence to be taken before the Commissioner upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence in a prior proceeding." Smith v. Chater, 99 F.3d 635, 638 n. 5 (4th Cir. 1996). The Fourth Circuit has held that evidence is new "if it is not duplicative or cumulative." Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991). A piece of evidence "is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. Additionally, the evidence must bear on "the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). Simply because the evidence must bear on the period on or before the ALJ's decision does not mean it must have existed at that time. Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987). As long as the evidence relates to whether Claimant had a disability during the relevant time period, the Court should consider it. Id.

The Court has examined all the additional documents Claimant has submitted and finds none of them present new and material evidence so as to warrant a remand. On page 2 of the attachments, Claimant presents a document from Dr. Long advising her not to take a job involving lifting more than 10 pounds. One of the criteria of sedentary work is not having to lift more than 10 pounds. 20 C.F.R. § 220.132(a). Although the ALJ's RFC stated Claimant could

perform light work, the VE identified several sedentary positions Claimant could perform.  (Tr. 29-31, 438).  Thus, this evidence is not reasonably likely to change the outcome of the case and so is not material.  <u>Wilkins</u>, 953 F.2d at 96.  On page 11, Claimant is noted to have eye pain and nausea.  Claimant had previously reported nausea, so this part is not new evidence.  <u>Wilkins</u>, 953 F.2d at 96; (Tr. 243, 425).  While the Court is not aware of any other records regarding eye pain, it is highly unlikely a bare notation of it would change the ALJ's outcome.  Thus, this evidence is not material.  <u>Wilkins</u>, 953 F.2d at 96.  On page 12, Claimant was found to have trigeminal neuralgia (i.e., headaches).  Claimant complained of this at the hearing before the ALJ.  (Tr. 29, 425).  This evidence is therefore not new.  <u>Wilkins</u>, 953 F.2d at 96.  On page 18, Claimant was found to have uncontrolled diabetes.  This is again not new evidence since the record already contains such a finding.  (Tr. 363).  Claimant complained of upper quad pain on page 24, but had previously complained of this before.  (Tr. 237).  Again, this is not new evidence.  On page 38, Claimant was reported to have pancreatitis.  The Court is not aware of any records in the transcript showing this.  Nevertheless, Dr. Breed also reported when making this diagnosis that Claimant "was discharged home feeling pretty good."  This makes it unlikely the ALJ would change his decision, and thus the evidence is not material.

While the above evidence represents merely a sampling of the additional records submitted by Claimant, similar analyses could be conducted regarding every page.  Many of the records simply provide additional information regarding impairments already described in the transcript.  This makes them "duplicative or cumulative" and so not relevant.  <u>Wilkins</u>, 953 F.2d at 96.  To the extent the records do present new evidence, they are not likely to change the outcome fo the ALJ's decision.  This also makes them irrelevant.  <u>Id.</u>

Since none of the records submitted by Claimant presents new and material evidence, they cannot serve as a basis for remand to the ALJ. 42 U.S.C. § 405(g). The ALJ should thus be affirmed.

## IV. Recommendation

For the foregoing reasons, I recommend that:

      1.      Claimant's Motion for Summary Judgment be DENIED.

      2.      Commissioner's Motion for Summary Judgment be GRANTED since substantial evidence supports the ALJ's RFC and his decision that work exists for Claimant in substantial numbers in the national economy and because none of the medical records Claimant provided the Court present new and material evidence.

Any party who appears pro se and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. Since Claimant is proceeding pro se, the Court takes the time to inform her any objections must be received by the Court within this time frame, not merely placed in the mail. Objections must be received by April 10, 2007. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to the pro se Claimant.

DATED: March 27, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE